# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned On Briefs July 9, 2013

## STATE OF TENNESSEE v. ANTONIO DOCKERY

**Appeal from the Criminal Court for Shelby County**
**No. 09-06080     Chris Craft, Judge**

_____

**No. W2012-01024-CCA-R3-CD  -  Filed January 15, 2014**

_____

Appellant, Antonio Dockery, was indicted by the Shelby County Grand Jury for aggravated assault, stalking, and aggravated kidnapping. After a jury trial, Appellant was convicted of the offenses as charged in the indictment. As a result of the convictions, Appellant was sentenced to a total effective sentence of thirty-four years in incarceration. After the denial of a motion for new trial, this appeal followed. On appeal, Appellant presents the following issues for our review: (1) the evidence was insufficient to support the convictions; (2) the trial court improperly instructed the jury on aggravated kidnapping; (3) the convictions for aggravated assault and stalking violate double jeopardy; and (4) the trial court erred in admitting evidence of prior bad acts in violation of Tennessee Rule of Evidence 404(b). After a review of the record and the authorities, we determine: (1) that the evidence is sufficient to support the convictions; (2) Appellant's convictions for aggravated assault and stalking do not violate double jeopardy where the trial court properly instructed the jury on the evidence to consider when reviewing the stalking charge; and (3) Appellant waived any issue with respect to the admission of prior bad acts for failing to raise the issue in a motion for new trial. Further, we determine that the trial court erred in instructing the jury on aggravated kidnapping by failing to give the instruction from _State v. White_, 362 S.W.3d 559 (Tenn. 2012). The error was not harmless beyond a reasonable doubt. Consequently, Appellant's aggravated kidnapping conviction must be reversed, and he must receive a new trial at which the jury is instructed in accord with _White_. The remaining judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Trial Court are Affirmed in Part, Reversed in Part, and Remanded.**

JERRY L. SMITH, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ALAN E. GLENN, J., joined.

R. Todd Mosley, Memphis, Tennessee, for the appellant, Antonio Dockery.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; Amy P. Weirich, District Attorney General, and Marianna Bell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Factual Background*

In September of 2009, Appellant was indicted by the Shelby County Grand Jury for aggravated assault, stalking, and aggravated kidnapping. All three of the indictments arose after incidents that occurred during his relationship with the victim, Erica Craft. Appellant and the victim first started dating in 2006. Shortly thereafter, Appellant moved in with the victim at her residence on Percy Road. The victim had four children. Appellant is the father of the victim's daughter who was born on December 26, 2008.

On July 31, 2008, the victim called the police after coming home from work to find Appellant at the house with four or five of his friends. At the time, the victim was pregnant. She asked Appellant to ask his friends to leave the house. Appellant became angry, was "in a rage" and proceeded to curse at the victim and call her names. The victim was scared and threatened to call the police. Appellant told the victim he would "beat" her. Appellant left when the victim called the police.

When the police arrived, the victim provided a written statement outlining Appellant's threats. Officer John Granberry with the Memphis Police Department responded to the call. The victim was "really upset and screaming, crying . . . ." However, she assured the police that she felt safe staying at the home. The police were unable to locate Appellant at that time. The victim refused an offer of transport from the police because Appellant reportedly "left without the key." The police had the victim fill out a "hold harmless form."[1] Appellant later called the victim to apologize, telling her he was "sorry for getting . . . carried away and he didn't mean any harm." Appellant was allowed to return to the residence.

On February 6, 2009, Appellant and the victim got into another argument. During the argument, the victim left the home with her children. After she left the house, she realized that she forgot the baby formula at the house. She returned home, leaving the children in the car in the driveway. She entered the kitchen through the side door. Appellant closed the

---

[1] At trial, one of the officers explained that a "hold harmless" form was a "form of instructions directed to the victim of domestic violence telling them their rights . . . [and offering] them transportation to a safe place, especially when the suspect is not in custody."

door behind the victim and prohibited her from leaving the house. According to the victim, Appellant "pushed" her against the door and "choked" her while the children were still outside in the car. Appellant told a friend standing outside to bring the children into the house. The friend brought the children into the house. The victim said Appellant was "going crazy"; she told Appellant she was going to call the police. Appellant left the house but returned before police arrived. According to the victim, Appellant was "in a rage" and did not hit her but "raised his arm up" hitting the light fixture in the kitchen. The light fixture fell and hit Appellant on the head. Appellant ran from the house "screaming and hollering" and called his sister to come pick him up at the house. The victim managed to call 911 twice during this altercation.

Officer Alvin Clark with the Memphis Police Department responded to the domestic violence call. When he arrived, the inside of the home showed "disarray." The victim was shaking and "very excited." The police noticed blood droplets at the scene. The victim explained that the blood belonged to Appellant. The police took pictures of the marks around the victim's neck. The victim's bruises took about a week to go away.

The victim wrote a statement describing the incident. She stated the following:

I walked in the door. [Appellant] then closed the door behind me, locked it, and started to choke me saying, I'm going to give you what you want. He then choked me again and pushed me down and picked me up to choke me again, threw me against the wall, pushed me down and kicked my side and tried to hit me. But . . . when he raised his arm, he broke the light fixture. It fell and busted his head and then he called his sister to come and take him to the hospital. Before he left, he threw the phone - he threw my phone out [of] his pocket. He took it during the fight so I couldn't call the police. And took my rent money, $550, and left.

The victim declined transportation by police to another location. She informed authorities that one of her relatives would come to stay with her at the house.

Appellant later called and apologized for his behavior. He explained that he was angry because he thought the victim was with another man when she left to go to her mother's house. Again, the victim believed that Appellant was sincere in his apology and let him back into the house.

In April of 2009, the victim finally left the relationship. She moved to Mississippi with her children to stay with a cousin. The victim called Appellant from Mississippi to tell him that their relationship was over and that she wanted to "move on." The victim wanted

to get along with Appellant in the future because of their daughter. She informed Appellant that she had a new boyfriend.

On April 19, 2009, the victim and her new boyfriend, Curtis, were at the victim's mother's house in Memphis picking up the victim's daughter. Curtis waited in the car in the driveway. He saw Appellant pull in to the driveway and then pull out of the driveway. The victim got back into the car with her daughter and Curtis. As they left her mother's house, the victim saw Appellant driving up the street. He was holding out his hand in an attempt to get the victim to stop her car. The victim kept driving. Appellant drove up behind the victim and tried to make her pull over. He even rolled down his passenger-side window, trying to get the victim to pull over. The victim sped up to get in front of Appellant, and he pulled in behind her and "rammed into the trunk of [her] car." Appellant used his vehicle to push the victim's car, causing her car to fishtail.

When the victim got to the red light, Appellant "rammed [her car] again through the light." In order to avoid being in the intersection, the victim had to "hit the gas" and get out of the intersection because the light was red. As Appellant drove away, he hollered, "I'll catch you later, bitch. And I'll whip your ass." Appellant also threatened to "shoot [Curtis]" in the face.

The victim called the police again to report Appellant's behavior and then stopped at the police precinct on Raines Road. Officer Lee Walker was on duty that night. He heard a knock on the door. When Officer Walker answered the door, the victim was outside, "visibly upset" and crying. The victim had her daughter with her that night. The victim reported the assault, telling Officer Walker about Appellant's erratic behavior. Officer Walker observed the damage to the victim's vehicle and had the victim fill out a hold harmless form. The victim issued another statement in which she claimed:

> [M]y ex-boyfriend saw me driving past him and tried to stop me but I didn't stop. He then followed me, rammed the back of my car, and tried to make me wreck. My daughter was in the car with me also . . . . He pushed us through a red light and then hung out his window with a gun saying he was going to shoot me in the face.

An officer escorted the victim to the Mississippi state line.

The victim later obtained an ex parte order of protection against Appellant on April 22, 2009. The order "restrained and prohibited [Appellant] from abusing, threatening to abuse, or committing acts of violence upon [the victim]." The order was entered by the trial court on May 6, 2009, and set for a hearing on May 19, 2009. The order of protection was

served on Appellant on May 19, 2009. Following a hearing on the ex parte order, a one-year order of protection was issued. The order prohibited Appellant from calling, contacting, or otherwise communicating with the victim "directly or indirectly." It also prohibited Appellant from coming to the victim's place of employment or residence for any purpose. Appellant was also prohibited from "possessing, shipping, receiving, or transporting a firearm or ammunition."

The victim had to pay to replace the bumper on her car and to prime and paint the trunk after Appellant's actions.

On May 1, 2009, the victim and her children moved into a house on East Biscane in Shelby County. On May 15, 2009, Appellant called the victim and made plans to pick up his daughter.

Appellant did not show up to pick up the child but later called the victim and asked her to go downtown with him to talk about visitation arrangements. The victim complied. When the victim and Appellant returned to the victim's house, she allowed Appellant to come inside and watch television. The victim fell asleep on the couch. While she was asleep, Appellant looked through her phone. When the victim woke up, Appellant was "trying to have sex" with her. The victim refused. Appellant started yelling and screaming at the victim; he accused her of sleeping with another man and read some of the victim's text messages to Curtis. Appellant pushed the victim down a hallway and into her daughter's bedroom. Appellant hit the victim in the face. As a result, she fell onto the bed. Appellant told her he was "fixing to beat [her]."

At that point, Appellant got on top of the bed. He stomped the victim in the face, kicked her in the chest, and hit her in the face with his fist. The victim tried to cover her face during the ordeal. Appellant told the victim he was "fixing to kill [her]" as he continued to read text messages from the victim's phone. Appellant eventually pushed the victim back on the bed and left the room "screaming" and "hollering."

The victim got into the corner of the room because there was no way to leave the room. Appellant entered and exited the room several times. She then heard Appellant open the front door. Then she heard him close it and lock it. The victim could not leave the house after Appellant left the bedroom because there was only "one way in, one way out."

Appellant came back into the room at some point and pushed the victim back onto the bed. Appellant grabbed a steel lamp and hit the victim in the temple on the right side of her head. The victim fell down, and Appellant hit her again. Appellant picked up a television. The victim begged him for her life after Appellant told her he was going to kill her.

Appellant put the television down and instead hit the victim with his fists. He broke her nose.

The victim promised that she would not call the police. He instructed her to clean herself up, especially her face. Appellant left the house shortly thereafter. The victim was able to run to the front door and lock it. She was unable to find her car keys or her cell phone. Appellant stood outside the house at the window watching her and yelling at her. The victim felt as though she was unable to leave her own home.

The victim waited until Appellant left in his truck before she went outside. Her car keys and cell phone were on the front lawn. The cell phone battery was broken. The victim was able to drive her car to her mother's house where she called the police. The victim first reported that Appellant followed her home from the gas station. She later admitted that this was not true. She lied because she did not want her family to know that she was still talking to Appellant.

Officer Kebena Cash of the Memphis Police Department responded to the residence on Jeff Drive the night of May 16, 2009. Upon her arrival, she noticed the victim had suffered injuries to her face and nose. The victim was "shaking" and "afraid." The victim's statement revealed the following:

> [Appellant] followed me home . . . [he] pushed me down the hallway into my daughter's room and he pushed me on [the] bed. He then stood over me and began to . . . punch me . . . with his fist in my face. He started to kick me and punch me in my face. He picked up a lamp and struck me in my face with it. He locked the doors and took my cell phone so I couldn't call anyone.

The victim suffered injuries as a result of Appellant's behavior, specifically, bruises on her nose, chest, face, and arms. The victim also had a broken nose, swollen mouth, and knots on her head. The victim was unable to work for two weeks as a result of Appellant's behavior.

Appellant was located by authorities hiding in the attic of a residence at an address provided by the victim. When the officers approached Appellant, he claimed he "didn't do anything to her. I'm sure she done made something up." After being arrested, Appellant became belligerent, shouting threats and insisting he would "get" the victim when he got out of jail. Appellant even slammed his fists against his hands.

At the conclusion of the trial, a jury found Appellant guilty of aggravated assault, stalking, and aggravated kidnapping. The trial court sentenced Appellant as a Range II

offender for aggravated kidnapping and as a Range III offender for aggravated assault. The trial court sentenced Appellant to fourteen years at forty-five percent for aggravated assault, twenty years at 100 percent incarceration for aggravated kidnapping, and eleven months and twenty-nine days for stalking. The trial court ordered the sentences for aggravated kidnapping and aggravated assault to run consecutively, finding that Appellant had an extensive history of criminal activity and was a dangerous offender.

Appellant filed a motion for new trial prior to sentencing. He later filed an amended motion for new trial through counsel and several pro se motions for new trial. After a hearing, the trial court denied the motions for new trial. Appellant sought an appeal. On appeal, Appellant argues: (1) the evidence was insufficient to support the convictions; (2) the trial court erred by failing to instruct the jury as mandated in *State v. White*, 362 S.W.3d 559 (Tenn. 2012); (3) double jeopardy bars Appellant's convictions for aggravated assault and stalking; and (4) the trial court improperly admitted evidence of prior bad acts in violation of Tennessee Rule of Evidence 404(b).

*Analysis*

*Sufficiency of the Evidence*

Appellant argues on appeal that the evidence was insufficient to support his convictions for aggravated assault and aggravated kidnapping. Specifically, with regard to the conviction for aggravated assault, Appellant insists that the lamp he allegedly used to hit the victim was not a deadly weapon because it was not used and intended to cause serious bodily injury or death. The State disagrees.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994) (citing *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992)). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Harris*, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As

such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

## *B. Aggravated Assault*

To convict Appellant of aggravated assault in this case, the jury must have found that Appellant intentionally or knowingly caused the victim to fear imminent bodily injury and used or displayed a deadly weapon or caused bodily injury. *See* T.C.A. §§ 39-13-101, 102.[2] "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty . . . ." T.C.A. § 39-11-106(a)(2).

One acts "knowingly" when, with respect to a result of the person's conduct, the person "is aware of the conduct or is practically certain that the conduct will cause the result, irrespective of his or her desire that the conduct or result will occur." T.C.A. § 39-11-302(b), Sentencing Comm'n Cmts.

Appellant's main argument with regard to the sufficiency of the evidence to support the conviction for aggravated assault challenges whether the lamp is actually a deadly weapon. Appellant cites *State v. Sims*, 909 S.W.2d 46 (Tenn. Crim. App. 1995), as an analogous case, and claims that the lamp was not a deadly weapon because Appellant did not use it to inflict serious bodily injury, as used in the statutory definition of "deadly weapon". In other words, Appellant argues because there was no resulting serious bodily injury, the lamp was not actually a definition.

We disagree with Appellant's argument. A deadly weapon is not defined by the nature of the injury that is actually caused by the weapon. A deadly weapon is defined by

---

[2]Tennessee Code Annotated section 39-13-102 was modified in 2013 to require that a defendant intentionally or knowingly commits an assault that "results" in either serious bodily injury to another, the death of another, or involved the use or display of a deadly weapon or "[w]as intended to cause bodily injury to another by strangulation or bodily injury by strangulation was attempted." T.C.A. § 39-13-102 (a)(1)(A)(iv) (2013). This amendment took place after Appellant's trial.

the manner of use, in this case the question is whether the lamp was used or intended to be used in a manner "capable of causing death or serious bodily injury." T.C.A. § 39-11-106 (a)(5)(B). Appellant pushed the victim down a hallway when she refused to have sex with him, told her that he was going to kill her, and hit her in the temple twice with a heavy steel lamp. A seven-pound steel lamp used to hit the victim repeatedly in the temple and the head is certainly an "instrument which, from the manner in which it is used or attempted to be used, is likely to produce death or cause great bodily injury." *Morgan v. State*, 415 S.W.2d 879, 882 (Tenn. 1967). In other words, the lamp was a deadly weapon. In fact, this Court has determined that anything from pointed-toe cowboy boots to a hairbrush can be used as deadly weapon. *See, e.g. State v. Madden*, 99 S.W.3d 127, 137 (Tenn. Crim. App. 2002) (finding that cowboy boots were deadly weapon in an especially aggravated robbery case); *State v. Billy Ratciliffe*, No. 01C01-9303-CC-00099, 1994 WL 65142, at *1, 3 (Tenn. Crim. App., at Nashville, Mar. 3, 1994), *perm. app. denied*, (Tenn. Aug. 8, 1994) (affirming sentence in case where hairbrush was a deadly weapon). Appellant admits that the victim suffered bodily injury and we have determined that the evidence supports the conclusion that Appellant used or displayed a deadly weapon during the attack. This issue is without merit. Appellant is not entitled to relief.

*Aggravated Kidnapping and Jury Instructions*

Next, with regard to the conviction for aggravated kidnapping, Appellant argues that there was no evidence that he "knowingly confined the victim or that any confinement was 'significantly large'" as defined in *State v. White*, 362 S.W.3d 359, 576 (Tenn. 2012), such that the aggravated kidnapping conviction could be supported by the evidence. The State contends that the evidence was sufficient to show that Appellant knowingly confined the victim and substantially interfered with her liberty and the victim suffered bodily injury due to Appellant's behavior. In a related argument, Appellant contends that his constitutional rights were violated by the trial court's failure to instruct the jury as required by *State v. White*, 362 S.W.3d 559 (Tenn. 2012). He insists that the trial court committed plain error and that he is entitled to a new trial. The State concedes that the trial court erred in this regard but insists that the error was harmless because the proof established beyond a reasonable doubt that the victim's confinement went beyond what was necessary to accomplish the aggravated assault.

In a recent case, the Tennessee Supreme Court overruled the existing case law providing the due process analysis to be applied upon appellate review of dual convictions of kidnapping and an accompanying felony. *See White*, 362 S.W.3d at 578 (overruling *State v. Richardson*, 251 S.W.3d 438 (Tenn. 2008); *State v. Fuller*, 172 S.W.3d. 533 (Tenn. 2005); *State v. Cozart*, 54 S.W.3d 242 (Tenn. 2001); *State v. Dixon*, 957 S.W.2d 532 (Tenn. 1997); *State v. Anthony*, 817 S.W.2d 299 (Tenn. 1991)). Previously, this Court conducted a due

process inquiry in order to determine whether dual convictions were constitutionally permissible. *See, e.g., Richardson*, 251 S.W.3d at 441-45.

In *State v. Anthony*, 817 S.W.2d 299 (Tenn. 1991), the court addressed whether due process permitted or prohibited dual convictions for kidnapping and accompanying felonies such as robbery and rape because these accompanying offenses inherently involve some level of detention and confinement. *Id.* As an example, the court noted that assault might be an accompanying felony because detention and confinement against a victim's will could be included in the offense. *Id.* The court concluded that the due process analysis was "whether the confinement, movement, or detention is essentially incidental to the accompanying felony and is not, therefore, sufficient to support a separate conviction for kidnapping, or whether it is significant enough, in and of itself to warrant independent prosecution, and is, therefore, sufficient to support such a conviction." *Id.* at 306. The test was whether the kidnapping was "essentially incidental" to the accompanying offense. *Id.* at 307.

In *White*, our supreme court said that the separate appellate due process analysis in *Anthony* and its progeny was no longer necessary. The court determined that the inquiry "is a question for the jury after the appropriate instructions," with appellate review of the sufficiency of the evidence serving as the due process protection. *Id.* at 577-78. The court concluded that "the legislature did not intend for the kidnapping statutes to apply to the removal or confinement of a victim that is essentially incidental to an accompanying felony." *White*, 362 S.W.3d at 562. To that end, "trial courts must ensure that juries return kidnapping convictions in those cases in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony." *Id.* at 578.

To ensure due process protection of defendants, the court in *White* detailed a jury instruction that must be provided to juries. The instruction is designed to make sure that a jury finds beyond a reasonable doubt that the confinement or removal is significant enough, on its own, to support a kidnapping conviction or that the confinement was incidental to the accompanying felony. *Id.* We recognize that *White* overruled *Anthony* and the cases that followed, however, the extent of *White's* application is unknown because the offenses discussed in *White*, rape and robbery, inherently involve some form of confinement. Moreover, even though the court highlighted the accompanying felonies of rape and robbery, it did not overtly suggest that the *White* instruction was inapplicable to other felonies. The opinion did, however, imply that if the accompanying felony does not necessarily involve some form of confinement, the *White* instruction is unnecessary.

The following jury instruction regarding the "substantial interference" element of kidnapping was provided in *White*:

To establish whether the defendant's removal or confinement of the victim constituted a substantial interference with his or her liberty, the State must prove that the removal or confinement was to a greater degree than that necessary to commit the offense of [insert offense], which is the other offense charged in this case. In making this determination, you may consider all the relevant facts and circumstances of the case, including, but not limited to, the following factors:

• the nature and duration of the victim's removal or confinement by the defendant;

• whether the removal or confinement occurred during the commission of the separate offense;

• whether the interference with the victim's liberty was inherent in the nature of the separate offense;

• whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so;

• whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and

• whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

*Id.* at 580-81.

The case herein, tried in April of 2011, was prior to the decision in *White*. The jury was not instructed as guided by the supreme court. While the supreme court classified its ruling in *White* as one that clarified existing law rather than "creating a new standard for kidnapping" and specifically pointed out that it did "not articulate a new rule of constitutional law or require retroactive application," 362 S.W.3d at 578, the court has since remanded a number of cases for reconsideration in light of the decision in *White*. *See, e.g. State v. Robert Fusco*, No. M2012-01068-CCA-RM-CD, 2012 WL 6062856, at *1 (Tenn. Crim. App., at Nashville, Dec. 6, 2012), *perm. app. denied* (Tenn. Apr. 11, 2013) (applying *White* to analysis of jury instructions in opinion after remand). Furthermore, this Court has applied *White* to cases in the appellate pipeline on direct appeal that are not on remand from the Tennessee

-11-

Supreme Court. *See State v. Robert Jason Burdick*, No. M2012-01071-CCA-R3-CD, 2013 WL 2642313, at *12 (Tenn. Crim. App., at Nashville, June 11, 2013); *State v. James L. Dowell, III*, No. M2012-00520-CCA-R3-CD, 2013 WL 1804191, at *24 (Tenn. Crim. App., at Nashville, Apr. 30, 2013), *perm. app. denied* (Tenn. Oct. 16, 2013); *State v. Theotus Barnett*, No. W2012-00048-CCA-R3-CD, 2013 WL 2297128, at *10 (Tenn. Crim. App., at Jackson, May, 22, 2013).

Even more recently, in *State v. Cecil*, 409 S.W.3d 599 (Tenn. 2013), the Tennessee Supreme Court clarified *White*, applying the rational to dual convictions for false imprisonment and assault. 409 S.W.3d at 605. After determining that the trial court erred by failing to give a jury instruction that was in line with the instruction provided in *White*, the court applied *White* because the case was in the appellate pipeline at the time of the decision. The court then undertook a harmless error analysis rather than an analysis of the sufficiency of the evidence based on the existence of a non-structural constitutional error.[3] As this case was in the appellate pipeline at the time of the appeal, we must apply *White* as clarified by *Cecil*.

The instructions given by the trial court herein are almost identical to the instructions decried by our supreme court in *White*. Therefore, the error in the jury instructions that was present in *White* is present in this case. *See Robert Jason Burdick*, 2013 WL 2642313, at *12; *Theotus Barnett*, 2013 WL 2297128, at *10; *State v. Christopher Bryan Hancock*, No. E2011-00111-CCA-R3-CD, 2012 WL 4340693, at *8 (Tenn. Crim. App., at Knoxville, Sept. 24, 2012).

Because such an error is an instruction-related error, we must now determine whether the error was constitutional harmless error. *White*, 362 S.W.3d at 580, n.20; *Theotus Barnett*, 2013 WL 2297128, at *10. In *White*, our supreme court determined that the error was not harmless and a remand was required "[b]ecause [the court could not] conclude beyond a reasonable doubt that the jury verdict would have been the same absent the instructional error." *White*, 362 S.W.3d at 580, n.20. In other words, we must determine whether the error in the jury instructions herein was harmless beyond a reasonable doubt. *Cecil*, 409 S.W.3d at 610 (citing *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008) ("The existence of a non-structural constitutional error requires reversal unless the State demonstrates beyond a reasonable doubt that the error is harmless.")). In order to determine if the error is harmless beyond a reasonable doubt, we are instructed to ascertain whether a rational trier of fact could interpret the proof at trial in different ways. *Cecil*, 409 S.W.3d at 610; *White*, 362 S.W.3d at 579.

---

[3] In fact, the court determined that the intermediate appellate court had actually erred in conducting a sufficiency of the evidence analysis rather than a harmless error review. *Cecil*, 409 S.W.3d at 610-11.

-12-

Keeping this framework in mind we note that aggravated kidnapping is false imprisonment, as defined in § 39-13-302, committed: "(1) To facilitate the commission of any felony or flight thereafter; . . . (3) With the intent to inflict serious bodily injury on or to terrorize the victim or another; . . . (4) Where the victim suffers bodily injury; or (5) While the defendant is in possession of a deadly weapon or threatens the use of a deadly weapon." T.C.A. § 39-13-304(a).

There are many factual similarities between the case herein and *Cecil*, in which the supreme court said the instructional error was not harmless beyond a reasonable doubt. *See Cecil*, 409 S.W.3d at 607-13. In *Cecil*, the defendant and the victim engaged in an altercation in the defendant's home, resulting in the defendant's convictions for domestic assault and false imprisonment. The court noted that the trial court failed to give the *White* instruction and determined error on the part of the trial court because the jury was not instructed on substantial interference with the victim's liberty, a material element of the offense of false imprisonment. *Id.* at 610. The court explained that the proper method to determine whether the error was harmless beyond a reasonable doubt "is whether a rational trier of fact could interpret the proof at trial in different ways." *Id.* In *Cecil*, the proof was subject to more than one interpretation regarding "whether there was a removal or confinement of the victim that was not essentially incidental to the assault." The court held, therefore, that the defendant was entitled to a new trial on the false imprisonment charge. *Id.* at 613.

In the case herein, the proof shows that Appellant pushed the victim down the hallway into a bedroom of her residence. The bedroom had bars on the windows and the back door to the house was blocked by a dryer. In other words, the only way out of the residence was through the front door. While the victim was in the bedroom being assaulted by Appellant, he took her car keys and cell phone. Appellant went to the front door, opened it, and then "closed it back and locked it." The victim explained at trial that there was only "one way in" and "one way out" of the residence so she could not leave the house after Appellant locked the front door. However, there was no testimony that the victim was actively restrained by Appellant or that he actively prevented her from leaving. The testimony was about the layout of the residence and the way that it prevented the victim from even trying to leave without encountering Appellant along the way. After leaving Appellant in the bedroom and going to the front of the house, Appellant returned to the bedroom, struck the victim with a lamp several times, stomped on the victim with his feet, and punched her in the face. The assault lasted for approximately thirty minutes. The victim suffered a broken nose as well as bruises on her chest, arms, and face. During this time there was "no way" the victim could leave. When Appellant finally left the house the victim was able to run to the front door and lock it. Appellant stood at the window watching her and yelling at her, making the victim feel as though she was unable to leave her own home. She was unable to find her car keys or her cell

-13-

phone inside the house. When Appellant finally left, the victim found these items on the front lawn.

The victim initially told the police that Appellant followed her home from the gas station because she did not want her family members to know that she was still talking to Appellant despite their tumultuous past. She later admitted that the allowed Appellant to come into the house.

In order to consider the effect of the error of the trial court in failing to give the *White* instruction, we must determine if the proof was capable of more than one interpretation regarding "whether there was a removal or confinement of the victim that was not essentially incidental to the assault." *Cecil*, 409 S.W.3d at 612. In our view, we conclude that the evidence supports a finding of kidnapping where the victim was confined to the bedroom and, later, to the house, we also recognize that the evidence is capable of more than one interpretation. The State presented evidence that Appellant kept the victim in the residence during an assault that involved a steel lamp, his fists, and his feet. The victim's testimony was that there was only one way out of the house. She testified that Appellant repeatedly assaulted her before he pushed her down on the bed and left the room. The victim claimed that she could not get out through the window because it was blocked with bars and could not exit through the rear of the residence because it was blocked by a dryer. The victim did not claim that she tried to escape. Appellant took the victim's keys and locked the front door, as she claimed, the only way out of the house. Appellant eventually left the house. He then continued to block the victim from leaving the house. He stood outside the window, looking at her and yelling at her. After some time, Appellant finally left. It was only when Appellant left that the victim was able to go outside or the house. Once she was out in the yard she found her keys and phone in the grass. Had the jury been properly instructed, it could have concluded that the State failed to show removal or confinement of the victim by Appellant that interfered with the victim's liberty beyond that necessary for Appellant to assault the victim. We conclude, therefore, that the error was not harmless beyond a reasonable doubt. Appellant's aggravated kidnapping conviction must be reversed, and he must receive a new trial at which the jury is instructed in accord with *White*.

In consideration of the foregoing and the record as a whole, the aggravated kidnapping judgment is reversed, and the case is remanded for a new trial on that count.

### *Double Jeopardy*

Appellant argues that his dual convictions for aggravated assault and stalking violate double jeopardy. While conceding that he is limited to plain error review of this claim because of his failure to raise it in a motion for new trial, Appellant cites to *Blockburger v.*

*United States*, 284 U.S. 299 (1932), *State v. Watkins*, 362 S.W.3d 530 (Tenn. 2012), and *State v. Denton*, 938 S.W.2d 373 (Tenn. 1996), to support his argument.[4]  The State, on the other hand, disagrees.

Tennessee Rule of Appellate Procedure 3(e) provides, in pertinent part:

[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

Tenn. R. App. P. 3(e).

Additionally, "[a] motion for a new trial shall be in writing or, if made orally in open court, be reduced to writing, within thirty days of the date the order of sentence is entered. The court shall liberally grant motions to amend the motion for new trial until the day of the hearing on the motion for a new trial." Tenn. R. Crim. P. 33(b).  Further, a trial court loses jurisdiction with the filing of a notice of appeal.  *See State v. Pendergrass*, 937 S.W.2d 834, 837 (Tenn. 1996).  In the case herein, Appellant did not raise these issues in his written motion for new trial.  Therefore, we are precluded from considering these issues raised by Appellant on appeal unless they rise to the level of plain error.

In order to prevail under the plain error doctrine, five factors must be present: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the defendant must have been

---

[4]As part of this issue, Appellant also argues that his aggravated kidnapping conviction and aggravated assault conviction should be analyzed with the *Denton* factors.  Under *Denton*, resolution of a double jeopardy issue requires the following:

(1) a Blockburger analysis of the statutory offenses; (2) an analysis guided by the principles of *Duchac* [*v. State*, 505 S.W.2d 237 (Tenn. 1973) ], of the evidence used to prove the offenses; (3) a consideration of whether there were multiple victims or discrete acts; and (4) a comparison of the purposes of the respective statutes.  None of these steps is determinative; rather the results of each must be weighed and considered in relation to each other.

*Denton*, 938 S.W.2d at 381.  Appellant contends that because the assault and the kidnapping were one continuous act and the same evidence was used to convict him of both offenses they should be merged into a single conviction for assault.  Because we have already determined that the trial court's failure to instruct the jury as stated in *White* and reversed Appellant's conviction for aggravated kidnapping, remanding it for a new trial, we find it unnecessary to further address Appellant's argument with respect to the aggravated kidnapping and aggravated assault convictions.

adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. *See State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (adopting this Court's plain error test set forth in *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)); *see also* Tenn. R. Crim. P. 36(b).

In *State v. Bledsoe*, 226 S.W.3d 349 (Tenn. 2007), our supreme court revisited the question as to when an issue should be considered under the plain error doctrine. 226 S.W.3d at 353-55. In its analysis, the supreme court stressed that appellate courts should use plain error sparingly. *Id.* at 354. The court then stated the following:

> [A]n error "may be so plain as to be reviewable . . . , yet the error may be harmless and therefore not justify a reversal." *United States v. Lopez*, 575 F.2d 681, 685 (9th Cir. 1978); *see Adkisson*, 899 S.W.2d at 642. The magnitude of the error must have been so significant "'that it probably changed the outcome of the trial.'" *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir.1988)); *see also United States v. Douglas*, 818 F.2d 1317, 1320 (7th Cir.1987).

*Id.* It is the accused's burden to persuade an appellate court that the trial court committed plain error. *See United States v. Olano*, 507 U.S. 725, 734 (1993). Further, our complete consideration of all five of the factors is not necessary when it is clear from the record that at least one of them cannot be satisfied. *Smith*, 24 S.W.3d at 283.

Appellant notes that the Tennessee Supreme Court recently adopted a new standard for evaluating whether multiple convictions violate double jeopardy protections. *See Watkins*, 362 S.W.3d at 556 (adopting the standard announced in *Blockburger*, 284 U.S. at 304). Appellant contends the *Watkins* standard should not be applied retroactively when analyzing his convictions.

We disagree. In general, new rules of constitutional law are not given retroactive effect. *See Van Tran v. State*, 66 S.W.3d 790, 810-11 (Tenn. 2001). Our supreme court has stated, "'a new state constitutional rule is to be retroactively applied to a claim for post-conviction relief if the new rule materially enhances the integrity and reliability of the fact finding process of the trial.'" *Id.* at 811 (quoting *Meadows v. State*, 849 S.W.2d 748, 755 (Tenn. 1993) and citing T.C.A. § 40-30-222 (1997)). *Watkins* did not create a new state constitutional rule or change the analysis for determining when due process violation occurs; rather, *Watkins* clarified the test to be employed, aligning our state standard with the federal standard. *See Keen v. State*, 398 S.W.3d 594, 600 (Tenn. 2012). Accordingly, we conclude the standard articulated in *Watkins* should be applied herein to determine whether Appellant's convictions violate due process protections. As further support for our holding, we note that

the Tennessee Supreme Court in *State v. Cross*, 362 S.W.3d 512 (Tenn. 2012), retroactively applied the *Watkins* test when determining whether a defendant's multiple convictions violated double jeopardy protections. 362 S.W.3d at 519.

We, therefore, turn to address whether Appellant's convictions in this case violate double jeopardy protections pursuant to the *Blockburger* test, as adopted by our highest court in *Watkins*. The double jeopardy clause of the Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb . . . ." Article 1, section 10 of the Tennessee Constitution contains a similar provision. As our supreme court has noted many times, the three fundamental principles underlying double jeopardy provide protections against (1) a second prosecution after an acquittal; (2) a second prosecution after conviction; and (3) multiple punishments for the same offense. *Watkins*, 362 S.W.3d at 541; *see also State v. Pickett*, 211 S.W.3d 696, 705 (Tenn. 2007). This case concerns the last of these three categories.

The *Blockburger* test, as adopted in *Watkins*, addresses whether multiple convictions result in multiple punishments for the same offense. Pursuant to the *Blockburger* test, the threshold inquiry is whether the defendant's convictions arose from the same act or transgression. *Watkins*, 362 S.W.3d at 545. If the convictions do not arise from the same act or transgression, the state and federal prohibitions against double jeopardy are not implicated, and the inquiry ends. *Id.*

If, however, the convictions arose from the same act or transgression, the court must then determine whether the legislature intended to allow the offenses to be punished separately. *Id.* at 556. When the legislature has not clearly expressed its intent either to prevent or to preclude the dual convictions, the court must examine the statutes to determine whether the crimes constitute the same offense. *Id.* at 557. "The court makes this determination by examining statutory elements of the offenses in the abstract, rather than the particular facts of the case." *Cross*, 362 S.W.3d at 520. "[I]f each offense includes an element that the other does not, the statutes do not define the 'same offense' for double jeopardy purposes," and courts "will presume that the Legislature intended to permit multiple punishments." *Watkins*, 362 S.W.3d at 557.

As required by *Watkins*, we have examined the indictments and the relevant statutes, and we have considered whether the charges arise from discrete acts or involve multiple victims. *See* 362 S.W.3d at 556-57. The record provides two bases for concluding that Appellant's convictions do not arise from the same act or transgression, such that the state and federal prohibitions against double jeopardy are not implicated, and the inquiry ends. First, Appellant's convictions do not arise from the same continuous act. The indictment for aggravated assault was based upon the assault committed by Appellant on May 16, 2009. The

-17-

indictment for stalking, on the other hand, indicates that the relevant dates for the offense were between July 31, 2009, and May 16, 2009. Further, the trial court specifically instructed the jury that it was not to consider the events of May 16, 2009, when deliberating on the stalking charge. The jury is presumed to have followed the trial court's instructions. *State v. Woods*, 806 S.W.2d 205, 211 (Tenn. Crim. App. 1990). Therefore, because Appellant's convictions did not arise from a single act, Appellant's double jeopardy claim does not survive our threshold inquiry. Consequently, a clear and unequivocal rule of law was not breached. Moreover, our complete consideration of all five of the factors is not necessary when it is clear from the record that at least one of them cannot be satisfied. *Smith*, 24 S.W.3d at 283. Appellant is not entitled to plain error review of this issue.

*Prior Bad Acts*

Lastly, Appellant argues that the trial court erred in allowing evidence to be admitted in violation of Tennessee Rule of Evidence 404(b). Specifically, Appellant complains about evidence of prior assaults that was admitted to support the stalking conviction. Appellant insists that the evidence was highly prejudicial and the curative instruction offered by the trial court was insufficient to remove the prejudice. The State, on the other hand, contends that Appellant waived the issue for failure to raise an objection at trial.

At the outset, we note that the State correctly points out that Appellant failed to raise an objection to the testimony at trial. Appellant's failure to object to the statements at trial constitutes waiver of the issue on appeal. *See* Tenn. R. App. P. 3(e) and Tenn. R. App. P. 36(a) (stating "nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

Even if we were to review this issue under plain error, Appellant would not be entitled to relief. Rule 404(b), Tennessee Rules of Evidence, provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

The rationale behind the general rule of inadmissibility in Rule 404(b) is that the admission of evidence of other wrongs poses a substantial risk that the trier of fact may convict the defendant based upon the defendant's bad character or propensity to commit criminal offenses, rather than upon the strength of the evidence of guilt on the specific offense for which the defendant is on trial. *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008); *State v. James*, 81 S.W.3d 751, 758 (Tenn. 2002).

Evidence of other crimes, wrongs, or acts may be admitted as relevant to issues of "identity (including motive and common scheme or plan), intent, or rebuttal of accident or mistake." Tenn. R. Evid. 404(b), Advisory Comm. Cmts; *see Bunch v. State*, 605 S.W.2d 227, 229 (Tenn. 1980). To minimize the risk of unfair prejudice in the introduction of evidence of other acts, however, Rule 404(b) establishes protective procedures that must be followed before the evidence is admissible. *See* Tenn. R. Evid. 404(b); *James*, 81 S.W.3d at 758. Upon request, the trial court must hold a hearing outside the jury's presence to determine whether the evidence of the other acts is relevant to prove a material issue other than the character of the defendant. *James*, 81 S.W.3d at 758. The trial court must state on the record the specific issue to which the evidence is relevant and find the evidence of the other crime or act to be clear and convincing. *Id.* If the trial court substantially follows the procedures in Rule 404(b), the court's decision will be given great deference on appeal and will be reversed only if the trial court abused its discretion. *Id.* at 759.

In the present case, the testimony complained of by Appellant was the victim's testimony regarding Appellant's repeated assaults. In other words, the acts which formed the basis for Appellant's indictment for stalking. Therefore, we conclude that it was unnecessary for the trial court to follow the procedures in Rule 404(b). Additionally, the trial court gave the jury a lengthy instruction that it was only to consider the evidence as it related to the offense of stalking. Again, the jury is presumed to follow the instructions of the trial court. Appellant has not shown that a clear and unequivocal rule of law has been breached; he is not entitled to plain error review of this issue. Appellant is not entitled to relief.

*Conclusion*

For the foregoing reasons, the judgment for aggravated kidnapping is reversed and the matter is remanded for a new trial. The remaining judgments of the trial court are affirmed.


_____
JERRY L. SMITH, JUDGE